## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | |
| and | Case No.: 15-11727 |
| CHARLES RIVER WATERSHED ASSOCIATION, INC. | |
| Plaintiffs | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Regina McCarthy, Administrator | |
| and | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, REGION 1, H. Curtis Spalding, Regional Administrator | |
| Defendants | |

Plaintiffs, for their Complaint against Defendants, state as follows:

### NATURE AND PURPOSE OF ACTION

1.      Plaintiffs Conservation Law Foundation, Inc. ("CLF") and Charles River

Watershed Association ("CRWA") (hereinafter collectively "Plaintiffs") bring this citizens' suit

pursuant to 33 U.S.C. § 1365(a)(2) for injunctive, declaratory, and such other relief as may be

necessary to require Defendants Regina McCarthy ("Administrator"), Administrator of the

United States Environmental Protection Agency ("EPA"), and H. Curtis Spalding, Regional

Administrator of Region 1 of EPA (hereinafter collectively "Defendants") to perform their

nondiscretionary and mandatory duties under the Clean Water Act, 33 U.S.C. §§ 1251, *et. seq.*,

1

("CWA") and to implement and administer the Act in a manner that is not arbitrary and capricious or contrary to law.

2.      In particular, Defendants have failed to perform the following non-discretionary and mandatory duties:

(a)  failure to notify unpermitted commercial, industrial, institutional, and high density residential property dischargers of nutrient-polluted stormwater in the Lower Charles River of their responsibility to obtain discharge permits, and to send an application form with the notice in accord with 40 CFR § 124.52(b);

(b)  failure to notify unpermitted commercial, industrial, institutional, and high density residential property dischargers of nutrient-polluted stormwater in the Upper/Middle Charles River of their responsibility to obtain discharge permits, and to send an application form with the notice in accord with 40 CFR § 124.52(b); and

(c)  failure to make a final determination on Plaintiffs' February 17, 2009 petition for designation of commercial, industrial, institutional, and high density residential property stormwater dischargers of one acre or more of impervious area in the Charles River Watershed within 90 days pursuant to 40 CFR § 122.26(F)(5).

3.      Plaintiffs seek an order directing the Administrator to notify the above-identified stormwater dischargers of their obligation to obtain NPDES discharge permits and to include an application form with such notice. CWA § 505(a) & (d), 33 U.S.C. § 1365(a) & (d). In the alternative, Plaintiffs seek an order requiring Defendants to make a final determination regarding their February 17, 2009 petition. Finally Plaintiffs seek to recover attorneys' fees and costs of litigation, and to obtain any other relief this Court deems just and proper. *Id.*

**THE PARTIES**

4.      Plaintiff CLF is a nonprofit, member-supported environmental advocacy organization, incorporated in Massachusetts and headquartered at 62 Summer Street, Boston, MA 02110. CLF maintains offices in Boston, Massachusetts; Montpelier, Vermont; Concord, New Hampshire; Portland, Maine; and Providence, Rhode Island. In relevant part, CLF works on behalf of its New England-wide membership and with other environmental and community-based organizations and individuals to enforce environmental laws including the CWA. Some of CLF's members live, work and/or recreate on and along the Charles River, and are affected by the health of the river.

5.      Plaintiff CRWA is a non-profit, member-supported environmental organization incorporated in Massachusetts,with a principal place of business at 190 Park Road, Weston, Massachusetts, 02493. CRWA's mission is to protect the water quality, fish and wildlife habitat, recreational opportunities and scenic values of the Charles River and its watershed. CRWA is instrumental in working to restore and protect the health of the Charles River. CRWA's members live, work and/or recreate on and along the Charles River, and are affected by the health of the river.

6.      Defendant Regina McCarthy, in her official capacity as Administrator of the EPA, must effectuate and enforce the CWA, including but not limited to enforcement of Section 402(p)(2)(E), 33 U.S.C. § 1342(p)(2)(E); *see also* 40 C.F.R. § 122.26(a)(1)(v); 40 C.F.R. § 122.26(a)(9)(i)(C) and (D); 40 C.F.R. § 124.52(b).  As Administrator, she has the authority and ability to remedy the harm inflicted by Defendants' acts and omissions.

7.      Defendant H. Curtis Spalding, in his official capacity as Regional Administrator of Region 1 of EPA, supervises the administration and enforcement of the CWA in Region 1

including but not limited to enforcement of Section 402(p)(2)(E), 33 U.S.C. § 1342(p)(2)(E); *see also* 40 C.F.R. § 122.26(a)(1)(v); 40 C.F.R. § 122.26(a)(9)(i)(C) and (D); 40 C.F.R. § 124.52(b). As Regional Administrator, he has the authority and ability to remedy the harm inflicted by Defendants' acts and omissions.

## STANDING

8.      Since 1966, CLF has successfully advocated for the prevention of water pollution, the protection of coastal waters and ecosystems, and the restoration of water quality throughout New England. On behalf of its members, CLF has successfully fought through administrative and judicial forums to reduce the flow of pollutants into the Charles River Watershed in Massachusetts.

9.      CRWA works to protect the water quality, fish and wildlife habitat, recreational opportunities and scenic values of the Charles River. Now in its 50th year of advocacy, CRWA continues to work to improve the health of the Charles River, provides national leadership in watershed management and has been recognized for its achievements by the U.S. Environmental Protection Agency, the Natural Resources Defense Council, and River Network.

10.      Plaintiffs' members use the river, its tributaries and banks for fishing, canoeing, kayaking, swimming, hiking, bird watching, photography, other recreation, and education. They value the river's scenic beauty, its wildlife, avian and aquatic habitat, its natural resources and its recreational opportunities. Some members own real property abutting the Charles River and its tributaries. Others operate businesses adjacent or in close proximity to the Charles River. Plaintiffs' members are concerned about the impacts that unregulated stormwater discharges from land with impervious cover – which contains excessive levels of nutrients, pathogens and other pollutants – have on the health of the river and their ability to use and enjoy the Charles

River for its designated and existing purposes, including fishing, swimming, recreation, and aesthetic enjoyment. Members also care about the harm to their economic and property interests caused by stormwater pollution into the Charles River.

11.     Plaintiffs' members' injuries are caused, at least in part, by Defendants failure to notify commercial, industrial, institutional, and high-density residential property dischargers of their obligation to obtain CWA permits regulating and controlling pollutant discharges from stormwater runoff sources into the Charles River because the CWA regulations only require operators of stormwater discharges to obtain permits limiting their pollutant discharges after notice is provided by Defendants. 40 CFR § 122.26(a)(9)(iii).

12.     The Court can remedy Plaintiffs' injuries by requiring Defendants to notify the dischargers of their obligation to obtain CWA permits regulating and controlling pollutant discharges from these stormwater runoff sources into the Charles River.

## JURISDICTION AND VENUE

13.     Plaintiffs invoke this Court's subject matter jurisdiction under 33 U.S.C. § 1365(a) (citizen suit provision), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 2201 (declaratory judgment).

14.     Plaintiffs seek relief authorized by 33 U.S.C. § 1365(a).

15.     Pursuant to CWA § 505(b)(2), 33 U.S.C. § 1365(b)(2) and 40 C.F.R. § 135.2(b), on February 10, 2014, Plaintiffs, by and through their counsel, notified Defendants and Eric Holder, Esq., Attorney General of the United States, of their intent to file suit under the CWA in a letter via certified mail.

16.     The date of this complaint is more than sixty (60) days after the Plaintiffs mailed Defendants the Notice Letter.

17.     The CWA violations complained of in the Notice Letter are ongoing and continuous.

18.     Defendants remain in violation of the CWA and its implementing regulations.

19.     As of the filing of this Complaint, Defendants have not acted to redress the violations identified in the Notice Letter and this Complaint.

20.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(e) because the waters that are the subject of this action are located in Massachusetts, Plaintiffs are located in this judicial district, and Defendants have an official place of business in this District and perform duties with respect to the subject matter of this Complaint in this district.

## STATUTORY AND REGULATORY BACKGROUND

**Clean Water Act and Related State Law**

21.     The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a).  This includes the elimination of "the discharge of pollutants into the navigable waters" and attainment of "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33 U.S.C. § 1251(a)(1) and (2).

22.     The CWA defines "navigable waters" as "waters of the United States." CWA § 502(7), 33 U.S.C. § 1362(7).

23.     The Charles River and its tributary streams  are waters of the United States as that term is defined in EPA's implementing regulations. 40 C.F.R. § 122.2.

24.     The CWA requires all states to adopt water quality standards ("WQS") for their water bodies, subject to EPA review. CWA § 303(c)(1), 33 U.S.C. § 1313(c)(1).  The WQS must: (1) designate uses of the waterway (*e.g.*, protection of aquatic life and recreational uses);

(2) set water quality criteria, expressed as either narrative or numeric standards; and (3) contain an anti-degradation policy that protects existing uses. *See* 33 U.S.C. § 1313; 40 C.F.R. § 131.10-12.

25.     A WQS must take into account the water's "use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes . . . ." 33 U.S.C. § 1313(c)(2).

26.     Massachusetts law establishes various WQS or class designations for surface waters, explains the criteria for each such class, and provides that a water body may not be degraded from its designated uses. *See* 314 Mass. Code Regs. § 4.00.

27.     Section 303(d) of the CWA and its implementing regulations require states to identify impaired water bodies that do not meet WQS after the implementation of technology-based controls and to prioritize and schedule them for the development of total maximum daily loads (TMDLs). 33 U.S.C. § 1313(d), 40 CFR § 130.7.

28.     TMDLs set the maximum pollutant load that a body of water can receive while maintaining the WQS and must account for all contributing sources of pollution. CWA § 303(d)(1)(C), 33 U.S.C. § 1313(d)(1)(C).

29.     EPA regulations require that TMDLs include: (1) the "wasteload allocation" ("WLA"), or the portion of the pollutant load allocated to existing or future point sources; (2) the "load allocation" ("LA"), or the portion of pollutant load allocated to nonpoint sources; and (3) a margin of safety which takes into account any lack of knowledge concerning the relationship between pollution controls and water quality. CWA § 303(d)(4)(A), 33 U.S.C. § 1313(d)(4)(A), 40 C.F.R. §§ 130.7(c)(1), 130.2(i), (g), (h).

30.     States must submit their TMDLs to the EPA Regional Administrator for approval. CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2), 40 C.F.R. § 130.7.

31.     A "point source" is defined under the CWA as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." CWA § 502(14), 33 U.S.C. § 1362(14). EPA's implementing regulations follow this definition. *See* 40 C.F.R. § 122.2.

32.     Federal National Pollutant Discharge Elimination System (NPDES) permits for point source discharges must contain limitations that are "necessary to meet water quality standards." CWA § 301(b)(1)(C), 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. § 122.44(d). These limitations are known as water quality based effluent limitations ("WQBELs").

33.     EPA regulations recognize that a TMDL WLA is a "type of water quality-based effluent limitation." 40 C.F.R. § 130.2.

34.     Section 402 of the CWA requires permits for "a discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." CWA § 402(p)(2)(E), 33 U.S.C. § 1342(p)(2)(E).

35.     The CWA and its implementing regulations mandate that, after a determination either that stormwater controls are needed as part of WLA established in TMDL, or that stormwater discharges contribute to a violation of a water quality standard, the discharges must be regulated by permit. 40 CFR § 122.26(a)(1)(v); 40 CFR § 122.26(a)(9)(i)(C) & (D).

36.     The Code of Federal Regulations provides, in relevant part, that:

> Whenever the Regional Administrator decides that an individual
> permit is required under this section, . . . the Regional
> Administrator shall notify the discharger in writing of that decision
> and the reasons for it, and shall send an application form with the
> notice. The discharger must apply for a permit under §122.21
> within 60 days of notice, unless permission for a later date is
> granted by the Regional Administrator.

> 40 CFR § 124.52(b).

37.     Assigning a point source to the WLA in a TMDL places that source into the jurisdiction of the NPDES permit program.

38.     Massachusetts Surface Water Quality standards designate the Upper/Middle Charles River and the Lower Charles River as Class B waters designated to support habitat for aquatic life and wildlife and recreational uses. 314 Mass. Code Regs. § 4.05(3)(b). In part, Class B waters shall not exceed the site-specific limits necessary to control accelerated or cultural eutrophication. *Id.* at § 4.05(5).

39.     The Charles River is listed as an impaired water because it fails to meet its Class B water quality designation. Under the CWA, its implementing regulations, and Massachusetts law, the Charles River must be restored to its Class B designation.

## FACTUAL BACKGROUND

**The Charles River**

40.     The Charles River watershed drains a 308-square mile area. The Upper/Middle Charles watershed drains 268 square miles, spans 70 miles, flows through 33 communities, and ends at the Watertown Dam where it connects with the Lower Charles River. *2011 Final Upper/Middle Charles Nutrient TMDL* at 11. It contains 31 impaired water body segments.

41.     The remaining 40 square miles of watershed drains directly into the Lower

Charles River from tributary streams. *2007 Final Nutrient TMDL Lower Charles River,*

*Executive Summary* at v. The lower Charles River wends through the highly urbanized

communities of Boston, Cambridge, Watertown, and Newton. *Id*.

**Stormwater Runoff Is the Primary Source of Phosphorus Pollution to the Charles River**

42.     Throughout the watershed, stormwater runoff discharges high levels of

phosphorous into the Charles River, which triggers excessive algae and aquatic plant growth and

low and/or highly variable dissolved oxygen levels.

43.     These recurrent algal blooms, including species known to be toxic, degrade the

Charles River and prevent it from attaining and maintaining its designated and existing Class B

uses, including but not limited to impacting its aesthetic quality, harming aquatic life and

impairing recreational use of the river, including boating, wind surfing, swimming and fishing.

44.     The recurrent algal blooms include toxic cyanobacteria (commonly known as

"blue-green algae") which further impairs the river from its Class B designation, by presenting

serious health risks as a result of which state and local agencies warn the public and their pets to

avoid contact with the river water.  Scheduled public swim events have also been cancelled due

to the cyanobacteria.

45.     If left without adequate controls, phosphorus pollution in the Charles River will

continue to degrade the water quality of the river.

46.     Because of these impairments, Massachusetts developed two Nutrient TMDLs,

one for the Lower Charles River ("Lower Charles TMDL") and one for the Upper/Middle

Charles River ("Upper/Middle Charles TMDL").

47.     Massachusetts maintains a "Quality System" in an EPA-approved Management Plan to ensure that the environmental data that it relies upon to identify impaired water bodies and formulate TMDLs are of known and documented quality. *See e.g. MA 2014 Integrated List of Waters* at 11-12.

48.     The Commonwealth of Massachusetts submitted each of the Charles River TMDLs to EPA for approval.

**The Lower Charles TMDL**

49.     To meet the Lower Charles TMDL, phosphorus loading must be reduced by 48% upstream of the Watertown Dam and by 62% in each of the subwatersheds draining to the Lower Charles River.  *Id.* at viii, Table ES-2.

50.     The Lower Charles TMDL set an aggregate WLA for each of the subwatersheds that drain into the Lower Charles and for the river above the Watertown Dam, which contributes to phosphorus loading in the Lower Charles. *Lower Charles TMDL* at vii-viii.

51.     This aggregation of sources in the WLA was "based on extensive amounts of technically sound data and information that confidently define existing loads and the phosphorus reductions that are needed from the major source areas." *Id*. at 84. The three categories include "(1) contributions from the Upper/Middle Charles River above Watertown Dam; (2) non-CSO drainage areas that discharge directly to the Lower Charles River; and (3) CSO discharges." *Id*. at 85. The allocations for the non-CSO drainage areas in the Lower Charles River include all sources that discharge to the major tributaries and smaller drainage systems. *Id*.

52.     In particular, "The TMDL analysis has determined that large reductions in nutrient loading to the Lower Charles River are needed to reduce algal biomass in the Lower Charles and attain the related Massachusetts Water Quality Standards." *Id*. at 97.

53.     The Lower Charles TMDL sets out an implementation plan for reducing the nutrient loads to the Lower Charles River to meet the TMDL. *Id*.

54.     The Lower Charles TMDL determined that "based on the magnitude of the phosphorus reductions called for in this TMDL, a watershed-wide implementation plan is called for." *Id*. at 98. The TMDL "requires the control of and/or elimination of several nutrient sources to the Charles River …." *Id*.

55.     The Lower Charles TMDL determined that stormwater runoff constitutes a major source of phosphorus loading that must be controlled and/or eliminated, including from lands with higher percentages of impervious cover, *i.e.* commercial, industrial, institutional, and high density residential, which generate more surface runoff. *Id*. at 99-101, 113, and Table 6.2 and Figure 6-1.

56.     Current controls for storm water runoff are inadequate to meet the TMDL's water quality goals for nutrients. *Id*. at 114.

57.     The data included in and supporting the TMDL "demonstrates that additional controls may well be needed on many storm water discharges." *Id*. at 113-14.

58.     EPA, which developed the TMDL with the Massachusetts Department of Environmental Protection, approved the Lower Charles TMDL on October 17, 2008. http://www.epa.gov/region1/eco/tmdl/approved.html#ma.

59.     The Lower Charles River continues to suffer eutrophication, excessive algae biomass and blooms (including toxic cyanobacteria), and other impacts from excessive phosphorus pollution.

**The Upper/Middle Charles TMDL**

60.     The Upper/Middle Charles TMDL, developed after approval of the Lower

Charles TMDL, provides a maximum phosphorus allocation for the Upper/Middle Charles River

above the Watertown Dam.

61.     The Upper/Middle Charles TMDL was developed to achieve water quality

standards in the Upper/Middle portions of the river and also to meet the phosphorus load

allocation established in the Lower Charles TMDL.

62.     To achieve these dual goals, the Upper/Middle Charles TMDL requires reductions

in stormwater phosphorus loads based upon land use.

63.     The Upper/Middle Charles TMDL places all stormwater pollution sources in the

WLA and requires a 51% reduction in annual phosphorus load from stormwater.  To achieve this

reduction the TMDL "sets phosphorus discharge limits for stormwater by land use category."

*Upper/Middle Charles TMDL* at 5.  It establishes a 65% reduction in phosphorus loading from

all intense land uses (commercial, industrial, institutional, and high density residential sites).

*Upper/Middle Charles TMDL* at 5, 71, 75-76.

64.     On June 10, 2011, EPA approved the Upper/Middle Charles TMDL.

http://www.epa.gov/region1/eco/tmdl/approved.html#ma.

65.     Since the Upper/Middle Charles TMDL was approved, the Upper/Middle and

Lower segments of the Charles River continue to suffer eutrophication, excessive algae biomass

and blooms (including those containing toxic cyanobacteria), and other effects of excessive

phosphorus pollution.

13

**Residual Designation Authority in the Upper Charles River**

66.     In November 2008, the Regional Administrator issued a Record of Decision

("ROD") entitled "Residual Designation Pursuant to Clean Water Act Region I" pursuant to

CWA § 402(p) and based on 40 C.F.R. § 122.26(4)(9)(i)(C) & (D) that unpermitted stormwater

discharges contribute to water quality violations in three upper Charles River watershed

municipalities – Milford, Bellingham, and Franklin, MA. EPA also determined that storm water

controls are needed for stormwater discharges from properties with two or more acres of

impervious cover based on WLAs "that are part of a Total Maximum Daily Load for the

discharge of phosphorus to the Lower Charles River  and its tributaries." ROD at 2.  Therefore,

these property owners were required to obtain NPDES permits and to implement controls.

67.     In accord with the findings in the ROD, the Regional Administrator issued a Draft

General Permit for these specified dischargers in the three municipalities in April 2010. 75 Fed.

Reg. 20,592 (Apr. 20, 2010), as amended by 75 Fed. Reg. 51,458 (Aug. 20, 2010).

68.     In combination with their comments on the ROD, on February 6, 2009, Plaintiffs

formally petitioned the Administrator for designation of all private commercial, industrial,

institutional, and high-density residential property stormwater dischargers of one acre or more of

impervious area in the entire Charles River Watershed ("Plaintiffs' Petition"). This petition, if

granted, would extend Region 1's permit program across the Charles River watershed, to

properties with one acre or more of impervious surface.

69.     Since the dates described in paragraphs 66-68, Defendants have taken no further

action on the Draft General Permit or on Plaintiffs' Petition.

## COUNT I: FAILURE TO PERFORM MANDATORY DUTIES WITH RESPECT TO LOWER CHARLES RIVER TMDL

70.     Paragraphs 1-69 are incorporated herein by reference.

71.     By developing and approving the Lower Charles TMDL, Defendants have determined that stormwater discharges from unregulated commercial, industrial, institutional and high density residential sites in the Charles River Watershed are contributing to violations of water quality standards in the river as a result of nutrient pollution that prevents the Lower Charles River from attaining Massachusetts water quality standards.

72.     Defendants' approval of the Lower Charles TMDL constitutes a determination that owners of commercial, industrial, institutional and high density residential land that discharge stormwater in the Charles River watershed shall obtain permits under the provisions of the CWA and EPA's implementing regulations.

73.     Defendants have violated the CWA by failing to notify commercial, industrial, institutional, and high density residential dischargers responsible for stormwater runoff in the Charles River watershed that they must apply for NPDES discharge permits based on the determination contained in the TMDL. 40 CFR § 124.52(b).

74.     Defendants have violated the CWA by failing to include an application form with any such notice. *Id.*

75.     These failures violate the Defendants' nondiscretionary duties subject to citizen-suit enforcement.

## COUNT II: FAILURE TO PERFORM MANDATORY DUTIES WITH RESPECT TO UPPER/MIDDLE CHARLES RIVER TMDL

76.     Paragraphs 1-75 are incorporated herein by reference.

77.     By approving the Upper/Middle Charles TMDL, Defendants have determined that stormwater discharges from unregulated commercial, industrial, institutional and high density residential sites in the Charles River are contributing to violations of water quality standards in the river as a result of nutrient pollution that prevents the Upper/Middle Charles River from attaining Massachusetts water quality standards.

78.     Defendants' approval of the Upper/Middle Charles TMDL constitutes a determination that owners of commercial, industrial, institutional and high density residential land that discharge stormwater in the Upper/Middle Charles River watershed shall obtain permits under the provisions of the CWA and EPA's implementing regulations.

79.     Defendants have violated the CWA by failing to notify commercial, industrial, institutional, and high density residential dischargers responsible for stormwater runoff in the Upper/Middle Charles River watershed that they must apply for NPDES discharge permits based on the determination contained in the TMDL. 40 CFR § 124.52(b).

80.     Defendants have violated the CWA by failing to include an application form with any such notice. *Id.*

81.     These failures violate the Defendants' nondiscretionary duties subject to citizen-suit enforcement.

## COUNT III: EPA FAILED TO ACT WITHIN 90 DAYS ON CLF's PETITION FOR RESIDUAL DESIGNATION

82.     Paragraphs 1-81 are incorporated herein by reference.

83.     The CWA and its implementing regulations mandated that the Administrator make a final determination on the Plaintiffs' Petition within 90 days of its submission. 40 C.F.R. § 122.26(f)(5).

84.     To this date, neither Defendant has acted upon Plaintiffs' petition.

85.     This failure violates the Defendants' nondiscretionary duties subject to citizen-suit enforcement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.  Declare that the Defendants have failed to perform their non-discretionary duties under the CWA and its implementing regulations to notify commercial, industrial, institutional and high density residential stormwater dischargers  in the Charles River watershed that they must obtain discharge permits;

2.  Declare that the Defendants have failed to perform their non-discretionary duty under the CWA and its implementing regulations to include a permit application form with each such notice;

3.  Order Defendants to comply with the CWA by notifying commercial, industrial, institutional and high density residential stormwater discharge operators in the Charles River watershed that they must obtain discharge permits;

4.  Order Defendants to comply with the CWA by including a permit application form with each such notice;

5.  In the alternative, declare that the Defendants have failed to perform their non-discretionary duty under the CWA and its regulations to act on Plaintiffs' Petition for Exercise of Residual Designation Authority within 90 days of submittal of the Petition;

6.  Order the Administrator to act on Plaintiffs' Petition for Exercise of Residual Designation Authority by a date certain;

7.  Award Plaintiffs' their reasonable costs and attorneys' fees; and

8.  Grant such other relief as the Court deems just and proper.



Respectfully submitted,

Dated:  April 28, 2015


CONSERVATION LAW
FOUNDATION, INC.

CHARLES RIVER WATERSHED
ASSOCIATION

By their attorney:

/s/ Caitlin Peale Sloan
CAITLIN PEALE SLOAN
BBO No. 681484
Conservation Law Foundation, Inc.
62 Summer Street
Boston, MA 02110
cpeale@clf.org
(617) 850-1770